OPINION OF THE COURT
Thomas F. Liotti, J.
The defendant is a homeowner and resident within the Incorporated Village of Westbury, residing at 577 Carle Road, Westbury, New York. He is charged with two violations of the *470 Village Code, to wit: article IV, § 50-6 (K) (2). The pertinent section of the Code states:
"In a Residence A District the following regulation shall apply * * *
"(2) The parking or storage of a commercial vehicle on a lot in any residence district shall not be deemed an accessory use and is prohibited, except that the parking or storage of one (1) commercial vehicle not exceeding one (1) ton carrying-capacity owned and used by the owner or tenant of the lot wholly within a private garage located on said lot shall be deemed an accessory use and is permitted.”
Following a trial of the instant matter and submissions of memoranda of law by both sides, the court decides as follows in favor of the municipality and against the defendant.
I. RESIDENCE A
Although not previously requested to do so by either side, the court, sua sponte, takes judicial notice that the property in question is in a residential A zone. A residential A zone within the Incorporated Village of Westbury is the "highest” zone within the Village comprised, almost exclusively, of single family residences.
II. HISTORY AND BACKGROUND OF THE SECTION
The court finds, again sua sponte, that the history of the law demonstrates that its enactment is a valid exercise of the police power of the municipality. The Incorporated Village of Westbury is located in central Nassau County. Its residents, numbering in excess of 14,000 inhabitants, are middle to upper middle class. Many are blue collar workers. The history of the Village, both before and after its incorporation in 1932, is such that it borders the pristine and well-to-do community of the Village of Old Westbury.
The North Shore of Long Island came to be known as "The Gold Coast”. Pulitzer Prize winning author, Robert A. Caro, best described the development of this part of Long Island in his remarkable book, The Power Broker, Robert Moses and the Fall of New York (Vintage Books ed 1975 [originally published by Alfred A. Knopf, Inc. in 1974]), in pertinent part as follows:
"The castles reflected the extent of their triumphs. Mrs. John S. Phipps, already mistress of seven other houses, *471 wanted her Long Island residence to look exactly like the great eighteenth-century English manor houses. To make sure that it would, the famous London manor-house architect George Crawley was summoned to the Wheatley Hills to design 'Westbury House’[1] and to stay for years until it was completed — a masterpiece of cherry-red brick and limestone, Georgian chimneys and a pale-gold roof rising above the trees, complete with a vault for the family silver, separate rooms for glasses and china and luggage, silver-plated bathroom fixtures and doorknobs, and a cellar so large that in 1960 the Nassau County Office of Civil Defense would designate it as a bomb shelter large enough to hold eighteen hundred persons. To make sure that the mood of England should not be lost in the furnishings, envoys of the Phippses scoured England for furniture made by Chippendale himself. The armoire in Mrs. Phipps’ bedroom had belonged to James II. The mantel clock in her study was made by the clockmaker to King George II. The desk in the hall outside it was the desk on which Cromwell had signed the death warrant of Charles I.
"And the Phippses were noted for their modesty and restraint. Westbury House, after all, contained only thirty-two rooms. The F. W. Woolworth mansion in Glen Cove contained sixty-two, and included not only solid gold instead of silver-plated bathroom fixtures and doorknobs but a dining-room ceiling gilded with fifteen hundred square feet of fourteen-carat gold. The Tiffany Estate in Laurel Hollow contained eighty-two. The Phippses had a private golf course and two private polo fields, but guests of the Marshall Fields in Lloyd Neck were not forced to limit their activities to polo or golf, since their hosts had also provided them with tennis courts, badminton courts, squash courts, indoor and outdoor swimming pools, sailboats, motorboats, skeet ranges — and a thousand-acre hunting preserve. No extravagance was too great. Finding that all the large hills in the Cold Spring Harbor area, where he wanted to build a chateau, were taken, Otto Kahn built a hill of his own, a small mountain, in fact, and since hauling the necessary earth and stone to the site required a railroad line, he built a railroad line.” (Id., at 150.)
In the early years of the settlement of both communities, Old Westbury was comprised mostly of estates, some famous, *472 including, among a great many others, what is now known as Old Westbury Gardens. Many of the early settlers within the Incorporated Village of Westbury serviced these grand estates. The Incorporated Village of Westbury Golden Jubilee Journal, published in 1982, recites some of this history in a synopsis written by a renowned writer and poet from Westbury, Arthur Dobrin:
"Westbury recovered from the war and resumed its bucolic and prosperous life. Not until the completion of the Long Island Railroad through Westbury in 1836 did the area begin to change. At first a small post office was built in 1841 with the only shop around it one blacksmith and wheelwright’s.
"The railroad made it easier for German, Italian, Irish and Polish immigrants to work Westbury’s farms and in 1857, St. Brigid’s Parish was founded.[2]
"At the same time more black families came to the area via the underground railroad. For some, Westbury was only one stop on the way to Canada, but several stayed in this area after being harbored in secret rooms in the homes of the Quakers. In the years after the Civil War until near the turn of the century, the few stores that comprised the small village, around the railroad depot mainly, were black owned.
"The next great change occurred in the 1890’s, as the enormous wealth accumulated by industrialists and capitalists made its way to Westbury as estates were built on the land of the old Quaker farms. A variety of stores were established to supply the needs of the wealthy neighbors and more immigrants settled here in order to work on the estates. Streets were laid. Post Avenue received electricity in 1902 and in 1914 a water company was founded.
"Camp Mills, later known as Mitchel Field, was built during WWI and it too added to Westbury’s development.
"Hicks Nursery, begun in 1853, had a staff of about 300 in the 1920’s, many of whom were immigrants from Durazzano, *473 Italy. Several of today’s prominent Westbury families had forefathers who began their work at Hicks. At its largest, the nursery occupied over 400 acres with more than 20 miles of nursery roads.” (See, Incorporated Village of Westbury Golden Jubilee Journal [1982].)
The history of both Villages, Westbury and Old Westbury, is that they have been and are interdependent upon one another. Old Westbury has always required the work of artisans, craftsmen and laborers. Although some of the North Shore’s work force lived on the estates they serviced, many lived in surrounding communities such as the Village of Westbury. A harmonious and symbiotic relationship has evolved over the past 150 or more years.
Initially many of the workers were employees of the estates. Over the years they became more entrepreneurial and independent and gradually established their own small businesses. Many of the businesses were loosely organized, family businesses and in some cases, operated out of the residential communities of Westbury. This is still the case. Commercial vehicles were stored at homes in the residential community in order to keep down the cost of overhead, because there is limited commercial vehicle storage space in the Incorporated Village, and because the closeness of the vehicles to homes provides both security and convenience not otherwise available. Today Westbury is an amalgam of professionals, white and blue collar workers — both from private industry and municipalities. A large segment of the Village, particularly at its southern, central to eastern part is comprised of artisans, craftsmen, laborers, landscapers and other small business owners. Many use commercial vehicles in their trades and businesses. The property in issue is not within the described south, central to eastern portion of Westbury. Thus, a commercial vehicle located in the area is even more conspicuous there since many of the properties in the immediate area do not also have commercial vehicles on their premises. Because of the exclusively residential character of this area, as well as the occupations of its residents, commercial vehicles parked in this part of the Village are perhaps more objectionable to the residents there, than they would be in another portion of the Village, where residents are more accustomed to seeing commercial vehicles parked in the area or own one or more themselves.
Nonetheless, the law applies to all residential parts of the Village. It was enacted in order to safeguard the residential *474 character and quiet enjoyment of the community. At the time of its passage, particular concern and need for the law was voiced by homeowners adjoining parked commercial vehicles where the sight of the vehicles was objectionable to those howeowners as well as to passersby. In addition, debris in the back of the vehicles, including, but not limited to, grass clippings, frequently gave off foul orders to anyone in proximity to them.
The vehicle in this case is not a landscaping truck. Rather, it appears to be a towing or wrecking truck of some substantial size. Its weight was not testified to and no evidence was offered in that regard.
Westbury and other areas throughout Nassau County and the State gradually changed their characters from rural to suburban communities. In the process they incorporated and codified their zoning laws. They then provided for "home rule” and restrictions on the use of land. The area changed again, particularly after World War II. With G.I.’s returning home, Westbury and other communities throughout Nassau developed a great deal of comparatively, low cost housing. The population grew and Westbury became a bedroom community for New York City with many of our denizens joining a significant Long Island work force and commuting to and from the City. Naturally, the occupations of the new residents tended toward white collar, business and professional fields. Still, many of those who made their living exclusively from the land remained in Westbury since their family roots extend, in some cases, to over 100 years in Westbury alone. In addition, their proud, hard working way of life persists.
Westbury, like other municipalities, has a zoning map that provides for a business B area in its core. This is for retail and professional uses. At portions of the perimeter of the Village are areas designated as commercial or industrial. Other areas of the Village provide for different classes of residential housing. These commercial areas are better suited to the storage of compatible vehicles than adjoining residential communities. Conflicts arise when the residential, rustic character and ambiance of a community is altered by the presence of commercial vehicles in a prohibited space. Accordingly, the Village Board felt that commercial vehicles should be covered and out of plain view.
III. LEGISLATIVE HISTORY
It is because of this concern, that commercial vehicles upset *475 the residential character of a community, that the Board of Trustees and Mayor for the Incorporated Village of Westbury in 1981 enacted the local law in issue. At that time, the commercial interests, property rights and other concerns of homeowners were aired. Similarly, the legislation was supported by a variety of community groups, including the West-bury League of Women Voters.
The defendant in this case appeared pro se. The Village was represented by Stephen K. Malone, Esq. A trial was held. The defendant does not challenge the constitutionality of the statute, hence the court does not intend to reach a discussion of that subject, except to state, in passing, that there is a presumption of the validity of this enactment and that the legislation is entitled to all due deference under the police power of the jurisdiction as well as the " 'minimum rationality’ test”. (1 Rathkopf, Zoning and Planning § 3.04, at 3-22 [1991]; Goldblatt v Hempstead, 369 US 590, 596 [1962]; De Sena v Guide, 24 AD2d 165 [2d Dept 1965].) The presumptions to which this legislation is entitled are not easily overcome, and this defendant has made no effort to do so. Therefore, the burden does not shift to the Village to prove the constitutionality or legality of the ordinance per se, under the presumption of validity rule. (Rathkopf, op. cit., §3.04, at 3-23.) No proof was offered by the defendant suggesting, in any way, that the ordinance is irrational or not related to a legitimate public purpose.
rv. PRIMA FACIE CASE AND VAGUENESS
The defendant has essentially alleged that the People have failed to meet their burden of proof factually, and that the ordinance is otherwise vague and unenforceable. The court respectfully rejects the defendant’s position.
While the court chooses to rely upon the plain meaning of the words in this ordinance since it does not have an incorporation by reference or definition section associated with it, the court notes, parenthetically, that the definitions for "park or parking” as contained in the State Vehicle and Traffic Law § 129 are consistent with the local law and the findings made herein, to wit: "Park or Parking — Means the standing of a vehicle, whether occupied or not, otherwise than temporarily for the purpose of and while actually engaged in loading or unloading merchandise or passengers.”
*476 It appears that the vehicle in question was parked rather than stored on the property, notwithstanding the fact that two citations have been issued on separate dates. Unlike the Village Code which prohibits "storage” of vehicles our ordinance precludes both their "parking” or "storage” in a residential area. "Storage” implies permanency whereas "parking” connotes transience. (See, Matter of Monument Garage Corp. v Levy, 266 NY 339 [1935].) In the case of our ordinance, they are the same for all intents and purposes, since we are talking about "parking” or "storage” on private property, typically in a driveway. In this case, the vehicle in question was owned by the homeowner’s son. The home appears to have been used as a work station or business location for the use of the vehicle. No testimony was elicited that would indicate that the vehicle was temporarily located on the property in order to do work for the premises at the behest of the homeowner. Rather, the testimony suggests that work was being performed at the home, but was not related to it. It appears that Mr. Bove’s son used this home as a place to work. An automotive repair business is not an authorized use of a residential premises under article IV, § 50-6 of the Village Code. Theoretically, the Building Inspector would have been within her rights in issuing a summons for this infraction as well.
a. Prima Facie Case
It is the People’s burden to prove, beyond a reasonable doubt, that the defendant violated the Village ordinance. The court finds that the People have sustained their burden.
The Building Inspector for the Village testified that on two separate occasions she observed the vehicle parked in the driveway of the defendant’s home. On at least one of these occasions, alleged parts from the vehicle appeared to be on the ground near it. The defendant’s son appeared to be engaged in working on the vehicle. Photos were introduced into evidence. Although they show that on one occasion the vehicle appeared to be partly inside of the homeowner’s garage, neither the testimony nor the photos introduced in evidence at the time of the trial, indicate that the vehicle was: "wholly within a private garage.” Accordingly, the exception provided for by the ordinance does not apply in this case.
The local law in question is contained within the Village’s zoning law. The law does not contain definitions or any incorporation by reference language indicating what is meant *477 by the words "parking”, "storage” or "commercial vehicle”. Such guidance would be helpful to all concerned, but the court finds that the absence of such language is not a fatal flaw in the ordinance, such that the court must strike it down or dismiss the tickets in issue. (See, People v Weinberger, 8 Misc 2d 953 [1957]; City of Rochester v Quine, 171 Misc 598 [1939]; Gilsey Bldgs, v Incorporated Vil. of Great Neck, 170 Misc 945, affd 258 App Div 901 [1939].)
The court finds that the legislative history of the ordinance together with the commonly understood meanings of these words allows the ordinance to survive a challenge on the basis of vagueness.
b. Vagueness
The court finds that the purpose of the ordinance is clear and the local law is valid. Indeed, the court finds that the intent of the statute is to preserve the residential character of the community. This is laudatory given the cries in some quarters, amidst this economic recession, that we encourage further industrial development and provide a more tolerant atmosphere for commerce. The needs of commerce must be balanced against the right of homeowners to live quietly and peacefully in an ecologically safe refuge, free from the noise and pollution associated with commercial vehicles and their repair. If this court permits this homeowner to park and repair commercial vehicles on these premises, nothing prevents the proliferation of this practice in other instances. The consequences of condoning such conduct is, therefore, ominous to the residential character of the community, as well as the value of the real estate therein. The court finds that in a modern suburban society that we must all learn to be sensitive to the needs of others, particularly when their sentiments are reflected in a sound zoning and environmental law as is the case here.
While there are those who may feel that the ordinance and this decision are anathema to the working class, quite the contrary is the case.[3] Laborers are entitled to as much peace and tranquility in their homes as anyone else. Now fully *478 developed as one of the oldest communities on Long Island, the Village of Westbury is a staid and beautiful setting. A half century ago, the presence of commercial vehicles within our residential areas posed little difficulty as it was more common to see commercial vehicles there and a greater number of people made their living from the land and labor. Moreover, the community was not densely populated. Today the standard size residential plot is approximately 75 feet by 100 feet (with some larger and smaller lots). Thus, it has become almost impossible to harbor commercial vehicles within the residential community without having a visual, noise, odor or other impact on surrounding homeowners. Commercial vehicles are simply no longer, in any way, in keeping with the residential community.
v. CONCLUSION
The court finds the defendant guilty as charged and directs that he appear for sentencing on January 5, 1993.

. The "Westbury House” is today known as Old Westbury Gardens. It was also prominently depicted as Oliver’s parents’ home in the movie Love Story.

. St. Brigid’s Roman Catholic Church was built, by and large, by Italian immigrants, many of whom took up residence within the Incorporated Village of Westbury in an area immediately across from the church, known as "Breezy Hill”. The church was built with old world charm, labor and proportion — an edifice of nearly prestigious, cathedral size, it was built with massive stone and mortar by hardworking artisans from southern Italy. It is reminiscent of so many Duomos from the old world, perhaps the most vivid to this court for comparison purposes is the Church of Santa Maria delle Grazie (the Church of St. Mary of Grace) in Milan, built in 1465-1490 and the home of a fresco of considerable renown, The Last Supper.

. For example, one of the early proponents of the commercial vehicle legislation in question is former Mayor Dominick Piscitelli, whose personal history is replete with awesome and courageous efforts on behalf of immigrants and in particular, Italians. (See generally, Lagumina, From Steerage To Suburb, Long Island Italians [Center for Migration Studies of New York, Inc., 1988].)